COCA–COLA CO. v. JOSEPH C. WIRTHMAN
DRUG CO.

No. 8986.

Circuit Court of Appeals, Eighth Circuit.

March 24, 1931.

Frank Troutman, of Atlanta, Ga., and W. C. Michaels, of Kansas City, Mo. (Harold Hirsch & Marion Smith, of Atlanta, Ga., on the brief), for appellant.

D. A. Murphy, of Kansas City, Mo. (John T. Harding and R. C. Tucker, both of Kansas City, Mo., on the brief), for appellee.

Before STONE and GARDNER, Circuit Judges, and WOODROUGH, District Judge.

STONE, Circuit Judge.

This is an action to restrain alleged unfair competition. From a decree dismissing the petition upon a hearing on the merits, this appeal is brought.

Plaintiff manufactures a soda water syrup known as "Coca-Cola," which it sells to operators of soda water fountains for use in making a drink which is known by the same name or, popularly, as "Coke." The unfair competition charged is that defendant, a purchaser from it of such syrup for the above use, in response to orders for Coca-Cola, is delivering and selling at its fountain a spurious and substituted product as genuine Coca-Cola. The answer admits the sale of the drink called Coca-Cola made from the syrup produced by plaintiff, but denies any substitution. Thus the major issue in the case was whether the syrup used in the drinks sold by defendant was genuine or spurious. The evidence reveals that the theory of plaintiff was that the defendant had altered the genuine syrup—probably by dilution with water or plain syrup.

The theory upon which the trial court disposed of the case was that the burden of proof was on appellant (plaintiff) to prove that the article sold was not genuine Coca-Cola, and that the appellee knew the spurious character of the thing sold, and that appellant had failed to prove either.

Appellant presents here two matters. The first has to do with the proof that the article sold by appellee was spurious; the second with the burden of proof of guilty knowledge. We find it necessary to examine only the first, as that is determinative of this appeal.

Appellant's proof as to spurious article sold was as follows: Genuine Coca-Cola contains phosphorous pentoxide, phosphoric acid, caffein, and a coloring agency made from burnt sugar or caramel which gives the syrup a reddish brown color. The coloring matter is no part of the "structure" of the mixture, but is decorative and useful in enabling a purchaser of the drink to recognize it. At various times between January 27,

1925, and February 7, 1927, agents of appellant called for and purchased, at appellee's soda fountain, small quantities of the Coca-Cola syrup which was being dispensed there. These purchases, after being carefully bottled and labeled, were sent to chemists, who made analytical examinations thereof. These analyses were as to specific gravity and as to character and percentages of ingredients. Under agreement of counsel, the evidence of these chemists was in the form of affidavits. Such evidence showed in detail the results of such analyses as to each sample, giving the specific gravity and the content percentages of phosphorous pentoxide, phosphoric acid, and caffein. Also the chemists testified as to the color, which was defined in comparison with two grades of Coca-Cola syrup (bottles and fountain) as so many degrees "lighter" than each of these grades. All of the analyses revealed the presence of all the chemical ingredients of genuine Coca-Cola. The differences, according to the analyses, between these samples and genuine Coca-Cola, is claimed to be found in the content percentages of the chemicals, in the gravity and in the color. Ascertainment of difference between two things obviously must be based upon a comparison of those two things. Here the comparison must be made between these samples of what appellee sold and genuine Coca-Cola. The analyses furnished the characteristic elements of the samples necessary for such comparison of them with the genuine Coca-Cola. The natural and direct way to compare these chemical and gravity results would be to set them alongside similar data from the genuine Coca-Cola. However, this was not done by appellant. Desiring to protect its trade secret in the mixture, it sought to accomplish this comparison and establish the difference in another way. This was by two pieces of evidence. The first is contained in the affidavit of C. E. Caspari, one of the two chemists (the other being A. L. Chason), who analyzed these samples. Chason had analyzed seven samples, and this witness had analyzed the same samples, as well as eight other samples. His testimony was: "I have examined the affidavit of Mr. A. L. Chason, filed in this case. Taking his analytical examination as correct, I have given most careful consideration to the analytical examination made of samples set out in his affidavit, as well as examination of samples made by me, and being thoroughly familiar with the product 'Coca-Cola,' I state that the samples referred to in the affidavit of Mr. Chason and the sam-

ples referred to in, and attached to this affidavit, are not Coca-Cola."

The other evidence was by the main chemist in charge of all chemists of appellant. It was his duty to see that "the syrup made and sold under the name of Coca-Cola, is at all times made uniform so that the syrup at each time it is manufactured be of the same consistency, appearance, have the same ingredients therein and the same quantities of each ingredient."

He testified to long experience with and thorough familiarity with "the ingredients and the proportions thereof, the color and the taste" of Coca-Cola. His affidavit contained the following:

"I have examined the affidavit of A. L. Chason particularly in regard to his analyses results obtained from examining the samples referred to in his affidavit, and I have examined the affidavit of C. E. Caspari particularly in regard to his analyses of the samples therein referred to. From my experience as hereinbefore described and from my knowledge of Coca-Cola from an analytical point of view and from knowing the ingredients that go into the product, 'Coca-Cola,' I state that all the samples referred to in the affidavit of Dr. Caspari and Mr. Chason are not Coca-Cola as made and manufactured by The Coca-Cola Company, the plaintiff in this case; that these samples show from the analytical examination that the contents are not the same as the contents of Coca-Cola syrup made and manufactured by The Coca-Cola Company, and in my opinion that the syrup so obtained and described in all of the said affidavits is not the syrup as made and manufactured by The Coca-Cola Company.

"Referring now specifically to the affidavit of A. L. Chason and particularly to the sample, Closet No. 17878 Mr. Chason finds from an analytical examination that the specific gravity is 26.25 degrees Baume. The specific gravity of Coca-Cola as made and manufactured by The Coca-Cola Company is higher than the specific gravity found in the sample. He fixes the phosphorous pentoxide content at .165%. This is lower than the phosphorus pentoxide content of Coca-Cola. He finds the caffein content to be .077%. This is lower than the caffein content of Coca-Cola.

"Referring to Sample No. 17880, the specific gravity Baume is found to be 26.45 degrees. This is lower than is the specific gravity of Coca-Cola. The phosphorus pent-

oxide content was found to be .167%. This is lower than the phosphorus pentoxide content of Coca-Cola. He found the caffein content to be .078%, and this is lower than the caffein content of Coca-Cola.

"Referring to Sample No. 17881, Mr. Chason found the specific gravity Baume at 25.95 degrees. This is lower than the specific gravity of Coca-Cola. He found the phosphorus pentoxide content to be .163%. This is lower than the phosphorus pentoxide content of Coca-Cola. He found the caffein content to be .075%. This is lower than the caffein content of Coca-Cola.

"Referring now to Sample No. 22341— Mr. Chason found the Baume specific gravity to be 25.46 degrees. This is lower than the specific gravity for Coca-Cola. He found the phosphorus pentoxide content to be .171%, and this is lower than the phosphorus pentoxide content of Coca-Cola.. He finds the caffein content to be .079%, which is lower than the caffein content of Coca-Cola.

"Referring to Sample No. 22342—Mr. Chason found the specific gravity Baume at 26.85 degrees. This is lower than the specific gravity of Coca-Cola. He found the phosphorus pentoxide content to be .172%, which is lower than the phosphorus pentoxide content of Coca-Cola. He found the caffein content to be .080%, which is slightly less than the caffein content of Coca-Cola.

"Referring now to Sample No. 22343— Mr. Chason found the specific gravity at 25.95 degrees Baume, which is lower than the specific gravity for Coca-Cola. He found the phosphorus pentoxide content to be .171%, which is lower than the phosphorus pentoxide content of Coca-Cola. He found the caffein content to be .080%, which is less than the caffein content of Coca-Cola.

"Referring to Sample No. 24913—Mr. Chason found specific gravity at 29.83 degrees Baume, which is higher than the specific gravity of Coca-Cola. He found the phosphorus pentoxide content to be .174% which is lower than the phosphorus pentoxide content of Coca-Cola. He found the caffein content to be .089%. This caffein content would not depict that the sample was not Coca-Cola.

"From an examination of comparisons as herein made and described, it is my opinion that there has been added to the Coca-Cola syrup, simple syrup or that it was diluted with water prior to the time that it was sold at the soda fountain.

"Referring to the affidavit of C. E. Caspari, and particularly to Sample No. 17878 —I find that the specific gravity was lower than that found in Coca-Cola; as was found the phosphorus pentoxide content, and as was the caffein content.

"Referring to Sample No. 17880—I find that the specific gravity is lower than for Coca-Cola; as is the phosphorus pentoxide content.

"Referring to Sample No. 17881—I find that the specific gravity is lower than that found for Coca-Cola; as is the phosphorus pentoxide content.

"Referring to Sample No. 22341—I find specific gravity lower and the phosphorus pentoxide content lower than for Coca-Cola.

"Referring to Sample No. 22342—I find specific gravity lower and the phosphorus pentoxide content lower than for Coca-Cola.

"Referring to Sample No. 22343—I find specific gravity lower and the phosphorus pentoxide content lower than for Coca-Cola.

"Referring to Sample No. 24913—I find specific gravity is higher, and the phosphorus pentoxide content lower than for Coca-Cola.

"Referring to Sample No. 27229—I find specific gravity lower, and the phosphorus pentoxide content lower, and I also find caffein content lower than for Coca-Cola.

"Referring to Sample No. 27237—I find specific gravity lower, and phosphorus pentoxide content lower and the caffein content lower than for Coca-Cola.

"Referring to Sample No. 27288—I find specific gravity lower than for Coca-Cola.

"Referring to Sample No. 27289—I find specific gravity lower, and phosphorus pentoxide content lower than for Coca-Cola.

"Referring to Sample No. 27291—I find specific gravity lower, and phosphorus pentoxide content lower than for Coca-Cola.

"Referring to Sample No. 27292—I find specific gravity lower, and phosphorus pentoxide content lower than for Coca-Cola.

"Referring to Sample No. 27295—I find specific gravity lower, and phosphorus pentoxide content lower than for Coca-Cola.

"Referring to Sample No. 27296—I find that the phosphorus pentoxide content is lower than the phosphorus pentoxide content of Coca-Cola.

"Referring again to the affidavits of Messrs. Chason and Caspari, and the color contents thereof, insofar as it relates to the samples referred to therein, I find that by taking the findings of Messrs. Chason and Caspari as a correct basis, that the color of the samples so taken are not in keeping

with the color of samples of Coca-Cola, and that the variations is as explained in the two affidavits.

"From all the samples and from all the examinations, and from my experience and knowledge concerning Coca-Cola, in my opinion, either simple syrup or water was added to the syrup as manufactured and made by The Coca-Cola Company."

As to this evidence to the effect that the analyses showed the samples were not genuine Coca-Cola, the trial court said:

"They went no further in the testimony than to say that a certain ingredient which they discovered by analysis in samples purchased from the defendant was either less or more than the like ingredient in the genuine product of the plaintiff. Upon the basis of this comparison made by them they testified that what the defendant sold was not genuine. Was this conclusion competent proof of the fact?

"It seems to me it was not. The desirability from a business standpoint of preserving the secrecy of its formula cannot change the rules of evidence by which a plaintiff is bound in proving its cause of action. The law of evidence does not permit a witness to testify to a mere conclusion. That the syrup sold by the defendant was not genuine Coca-Cola syrup certainly was a conclusion. That some one ingredient in the syrup sold by the defendant was more or less than the same ingredient in the genuine product of the plaintiff also was a conclusion. It is for the witness to testify to facts. It is for the trier of the facts, whether court or jury, to draw from the facts such conclusions as they support. A witness cannot say 'I have knowledge that one of the ingredients of genuine Coca-Cola syrup is phosphoric acid but I will not state the percentage of phosphoric acid in genuine Coca-Cola. I have examined a sample alleged to be spurious Coca-Cola and I find that it contains phosphoric acid in the amount of .232%. That is more than the percentage in the genuine article. My conclusion, therefore, is that the article I have examined is spurious.' For that is the very issue, whether the article is spurious and that is to be determined upon the facts in evidence, not upon a comparison of one fact in evidence with another which is not in evidence."

The issue here is as to the competency of this evidence of these two witnesses as to these claimed differences. Appellant supports the competency in two contentions: First, that such evidence is not mere con-

clusions but is evidence of a fact; that, if such are conclusions, the evidence was competent as expert testimony.

█ As to the first contention. Whether two things are alike or different certainly is a conclusion to be reached from a comparison of them. If the differences or similarities are such as an ordinary man may observe, there is no reason why the trier of fact should not make the comparison, and, independently therefrom, reach the conclusion. Appellant sought here to prove that the syrup sold was not Coca-Cola by making analyses of the syrup. It is not claimed that the corresponding elements in the genuine Coca-Cola are not known or that they cannot be ascertained by like analyses. In fact, the evidence shows that they are known to the witnesses who sought to make these comparisons and to state therefrom that the syrup was not genuine. Where all of the facts upon which a determination is based can be placed before the trier of fact and proper deduction of the determination therefrom does not require special training to adequately understand the significance of the facts, the determination thus made is a "conclusion" within the meaning of rules of evidence and, as such, is not admissible. The vice of such evidence is accentuated where such conclusion is of an ultimate fact to be determined by the trier of fact.[1] The Supreme Court has directly spoken on this matter of comparison in Schneider v. Barney, 113 U. S. 645, 648, 5 S. Ct. 624, 625, 28 L. Ed. 1130, where the court said: "The effort was to put the opinion of commercial experts in the place of that of the jury upon a question which was as well understood by the community at large as by merchants and importers."

█ We think admissibility of this evidence cannot be justified on the ground that it is the statement of a fact as distinguished from a conclusion.

In this connection, appellant urges that to compel it to reveal the percentages of ingredients in true Coca-Cola would result in divulging a valuable trade secret, and therefore this character of evidence should be received in order to protect its business found-

[1] Spokane & Inland Empire R. Co. v. U. S., 241 U. S. 344, 351, 36 S. Ct. 668, 60 L. Ed. 1037; Milwaukee & St. P. Ry. Co. v. Kellogg, 94 U. S. 469, 472, 24 L. Ed. 256; Chenery v. Employers' Liab. Assur. Corp. 4 F.(2d) 826, 827 (C. C. A. 9); Parker v. Elgin, 5 F. (2d) 562, 564 (C. C. A. 6); Hirning v. Live Stock Nat. Bank, 1 F.(2d) 307, 310 (C. C. A. 8); Shwab v. Doyle, 269 F. 321, 333 (C. C. A. 6); National Biscuit Co. v. Nolan, 138 F. 6, 8 (C. C. A. 8); Gentry v. Singleton, 128 F. 679, 680 (C. C. A. 8).

ed on this trade secret. It relies upon Jacobs v. Beecham, 221 U. S. 263, 31 S. Ct. 555, 55 L. Ed. 729. The situation in that case was essentially different from the one here. There a manufacturer was making pills which he was, to all intents, selling under the tradename of a long-established and widely advertised brand of pills made by the complainant under a secret formula. The court (page 271 of 221 U. S., 31 S. Ct. 555, 556) said: "If, in a technical sense, the burden of proof is on the plaintiff to prove that the defendant's pills are not made by his formula, there is at least a prima facie presumption of difference, just as in the case of slander there is a presumption that slanderous words are false. A different rule would prevent the owner of a secret process from protecting it except by giving up his secret. Again, when the defendant has to justify using the plaintiff's tradename, the burden is on him. Finally, as the case presents what is a fraud on its face, it is more likely that the defendant is a modern advertiser than that he has discovered the hidden formula of the plaintiff's success."

Here the situation is that of a purchaser of a product made under a secret formula who is accused of diluting the product. Presumably the purchaser is ignorant of the contents of the secret formula and with the chemical adherence thereto of the commercial product made therefrom. There is no basis in such a situation for any "prima facie presumption of difference". Nor does the appellee, accused of fraud, have to justify the sale of the product dispensed by it which was purchased from the appellant. Nor does the case present "what is fraud on its face". Obviously the case is one where the burden is upon the appellant to prove the dilution by competent evidence. Where that character of evidence is within its control it cannot avoid producing it solely because to do so would reveal its trade secret. This is essentially different from the situation in the Jacobs Case. It is easy to appreciate the desire of appellant to retain the secrecy of its formula. It can do so by refraining from selling its product to those who improperly use its product. There is no necessity to alter basic rules of evidence to secure this protection. However, when it comes into a court to restrain alleged fraudulent conduct by a purchaser from it in relation to its product and, it might be, to secure damages therefor, it is amenable to the ordinary rules of evidence, and one of those rules is that obtainable evidence of the facts to prove its contention cannot be supplied by conclusions drawn, in essential parts, from those withheld facts.

The vice of relaxing the rule in the manner here sought is illustrated by the evidence in this case. That evidence is the divergent results reached by the two chemists (Chason and Caspari) who examined the same seven samples of syrup bought from appellee. These analyses were as to five matters (specific gravity, Baume, phosphorus pentoxide, phosphoric acid, and caffein) and involved two color comparisons (with genuine bottling and genuine fountain syrup). This involved forty-nine results for the seven samples. In only three instances out of these forty-nine were the same results reached by the two chemists employed by appellant. In two samples there was agreement as to specific gravity and, in one sample, as to Baume degrees. Guided by the Chason analyses, witness Heath concludes that all but one of these samples were deficient in specific gravity in phosphorus pentoxide content and in caffein content. Guided by the analyses of the same samples by Caspari, he finds the same six samples deficient only in specific gravity and in phosphorus pentoxide. As to the other sample, analyzed by both, he concludes that the Chason result as to caffein would not depict that the sample was not Coca-Cola and, that both analyses show a "higher" specific gravity than Coca-Cola. As to the eight samples analyzed by Caspari alone, Heath concludes that the specific gravity and the phosphorus pentoxide are lower as to all and the caffein as to two. There is no evidence that the phosphoric acid content in any of the samples was deficient. As to caffein there is somewhat of a standard to use for comparison, since one sample which showed .089 per cent. caffein content was not disapproved as to the caffein and that percentage may be taken as approximately that in the genuine syrup. Out of six other samples analyzed by Chason the caffein content percentages found by him were .075, .077, .078, .079, .080, and .080. For the same samples, Caspari found, respectively, .084, .083, .086, .085, .087, and .088, and for the eight samples examined by him alone the caffein content percentages were .076, .077, .080, .081, .081, .082, .082 and .082. A comparison of these analyses figures with the .089 per cent. standard shows, in the main, very slight variations therefrom. If we are to accept the only theory shown by the evidence as to how this corruption of the true syrup was accomplished—that "either simple syrup or water was added" to the genuine syrup— these slight deviations are not unreasonably

748

as explainable by variations in the mixture of the commercial product put out by appellant as they are by any deliberate dilution by appellee. In this connection it is pertinent that these samples were bought in 1925, 1926, and 1927, and that during 1925 appellant sold 20,111,134 gallons of syrup and in 1926, 21,158,450 gallons—there are no figures for 1927. It is true that Heath testified that no syrup was permitted to go out until analysis thereof showed it was up to standard, but the consistently divergent results of analyses by two of its own chemists as to the seven samples of this alleged diluted syrup speak rather louder than his bare ipse dixit on that subject. At least they show the fallibility of analysis of this character of syrup. We have not adverted to this evidence for the purpose of commenting upon its weight but to show the absolute necessity of having evidence of the actual contents of the true syrup, as commercially put out by appellant, if there is to be any certainty whatever in these comparisons and to emphasize that to do otherwise would place the appellee completely at the mercy of the appellant without opportunity, even though entirely innocent, to meet the case so made against it. It would have to meet opinions not facts, and would not be able even to test those opinions by inquiry as to the essential facts upon which they were based by witnesses introduced by its opponent.

Another reason why appellant contends this character of evidence is admissible is because it is testimony of experts. The question here was whether appellee had altered the syrup bought by it from appellant. Appellant claimed there was a difference caused by dilution. This involved the matter of whether there was a difference between the syrup sold by appellee and that bought by him. Appellant sought to show this difference by analyses of the syrup sold by appellee and, based upon the results of such analyses, the statement of its witnesses that these results showed differences. They based this conclusion upon their knowledge of the constituents of the genuine syrup. Confessedly there is a chemical formula in accordance with which the genuine commercial syrup is made and to which it is supposed to conform. The statement of this formula and of the facts as to adherence thereto in the commercial product when compared with the analyses of these purchased samples comprised all of the data from which these witnesses concluded that the above differences existed. No reason is shown in the evidence why any layman, with the same data before him, could not readily determine therefrom whether such differences existed and do so as well as these witnesses. If this data carries a meaning not clear to the layman, then there may be place for expert testimony but this is in explanation of facts before the court and not by way of substitution therefor. The province of an expert is to aid in understanding facts already in evidence. It does not take an expert to know that there is a difference between .089 per cent. of caffein and .075 per cent. or .088 per cent. of caffein, although the significance of such differences may possibly be the subject of such expert testimony. But, before the significance can be explained, the difference must be shown. The misfortune of appellant here is that it does not wish to show this difference in the only clear way it can be shown by facts.

The situation here may be unfortunate for appellant, but such is often the position of a litigant. Except where there is some announced reason of public policy—such as incrimination or privileged communication—the rules of evidence have never bent to permit a party to a suit to refrain from divulging facts pertinent to the issues before the court simply because he might be injured by such facts becoming public. In saying this, we do not wish to be understood as meaning that under any and all circumstances, where secret trade formulas or trade secrets might have a bearing upon issues before a court, they must be revealed. As far as is consistent with a fair administration of justice, such secrets should be protected. But where such hold the essential facts of a controversy and no equally good evidence is obtainable, we see no reason why they should not be required. Certainly the most that could be properly asked would be the privilege of silence. To go further and permit opinion evidence based thereon to be used as a substitution therefor is going further than the courts have gone as to any other character of privileged testimony.

The decree should be and is affirmed.