**EVIS MANUFACTURING COMPANY,**
a corporation, Arthur N. Wells,
Petitioners,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 16481.

United States Court of Appeals
Ninth Circuit.

March 6, 1961.

832

Francis R. Kirkham, James Michael, Harry C. Scott and Pillsbury, Madison & Sutro, San Francisco, Cal., for petitioners.

Daniel J. McCauley, Jr., Gen. Counsel, Alan B. Hobbes, Asst. Gen. Counsel, Frederick H. Mayer and Thomas F. Howder, Attys., Federal Trade Commission, Washington, D. C., for respondent.

Before BARNES and HAMLEY, Circuit Judges, and FOLEY, District Judge.

ROGER T. FOLEY, District Judge.

Evis Manufacturing Company, a corporation, hereafter referred to as Evis, and Arthur N. Wells have petitioned this Court to review and set aside an Order made and entered by respondent Federal Trade Commission on the 23rd day of March, 1959, ordering petitioners to cease and desist from making certain specific representations in connection with the offering for sale, sale or distribution of the device known as the Evis Water Conditioner. Said Order was made in a proceeding before respondent Commission entitled, "In the Matter of Evis Manufacturing Company, a corporation, and Joseph T. Voorheis, and Arthur N. Wells, individually, and as officers of said corporation."

On February 5, 1954, respondent Commission issued its complaint charging petitioners with unfair methods of competition and unfair and deceptive acts and practices in commerce in connection with the sale and distribution of the Evis Water Conditioner. Petitioners denied the charges alleged in the complaint and denied any violation of the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq.

After a series of hearings in various places, Mr. Abner E. Lipscomb, Hearing Examiner, duly made and filed, on April 27, 1956, his "Initial Decision" reviewing testimony and evidence received upon the hearings stating his conclusions and his Order dismissing the complaint.

On appeal the Commission vacated said "Initial Decision" and remanded the case to the Examiner for the purpose of receiving evidence of further scientific tests of the Evis Water Conditioner.

Pursuant to the Commission's direction, additional scientific evidence was presented to the Examiner who then filed, on June 30, 1958, his "Initial Decision" after remand, again dismissing the complaint. Upon appeal the Commission reversed the Examiner's second "Initial Decision" holding, however, that there was no probative and substantial evidence of petitioners having falsely claimed that Evis Water Conditioner was made of a specially processed metal.

The Hearing Examiner correctly summarized and stated the gravamen of the Commission's complaint as follows:

"The Complaint.

"On February 5, 1954, the Federal Trade Commission issued its complaint in this proceeding, charging the Respondents with the dissemination of numerous false advertisements of their product, the 'Evis Water Conditioner', in violation of the Federal Trade Commission Act. The Evis Water Conditioner is described in the complaint as a product of metal construction, having the appearance of an oversized pipe coupling with an interior cross post integrally cast in place, which is intended to be fitted into water systems for the purpose of beneficially treating and conditioning water. The complaint interprets various statements and representations appearing in Respondents' advertisements, and, in effect, alleges that such statements and representations, so interpreted, are false, misleading and deceptive, and that, in truth and in fact, the Evis Water Conditioner

" '(a) is not made of a specially processed metal and it does not change the physical behavior of water passing through it by catalytic effect or otherwise;

" '(b) will not solve hard water problems or cause hard water to become soft or make hard water feel, taste or act softer or give it a silky-smooth quality for hair, bath, dishes, laundry or car wash;

" '(c) will not remove or reduce unpleasant odors or flavors in water or make water taste better, nor will it improve the taste of coffee or other foods;

" '(d) will not reduce the amount of soap used or effect a saving of soap expenses, nor will it effect a saving of fuel expenses for heating water;

" '(e) will not eliminate or reduce the harshness of water to hands or cause dishes or glassware to dry without leaving water stains;

" '(f) will not remove grease from drains or prevent or remove scale in boilers, water heaters, pipes, shower nozzles or other parts of a water system;

" '(g) will not prevent, reduce or eliminate scum, rust stains or corrosion, nor will it retard the pitting of metal;

" '(h) will not improve the action of chemicals used for water softening purposes;

" '(i) will not leach out alkali and salts in soil, improve the growth or production of agricultural or orchard products or plants, nor will it improve the texture or structure of soil;

" '(j) will not reduce the amount of water required for agricultural irrigation;

" '(k) will not have any beneficial effect on water.' "

The Commission issued its findings of fact, conclusions and Order, March 23, 1959.[1]

The petitioners, in support of their petition for review, summarized their argument as follows:

"A. The Commission erred in giving conclusive effect to the testimony of the Commission's experts, in giving no effect to the uncontradicted testimony of the successful performance of the Evis unit in actual operation, and in holding that reliable, substantial and probative evidence supports the charges that the Evis Water Conditioner will not perform as claimed.

"B. The Commission erred in failing to give due weight to the decisions of the Hearing Examiner who heard and saw the witnesses and had the better opportunity to evaluate their testimony. His decisions demonstrate the lack of merit in the Commission's case and this Court, on review, should accord to them the weight to which they are entitled.

"C. The Commission erred in giving weight to experiments performed by experts whose installations were not made in accordance with the manufacturer's instructions.

"D. The Commission erred in relying upon what it termed a showing that 3,000 installations of the Evis Water Conditioner were failures.

"E. The Commission erred in holding that petitioners' refusal to make a public disclosure of their method of processing the metal in the Evis unit should be construed as strong confirmation of the charges in the complaint."

Respondents state as the fundamental issue the following:

"The fundamental issue in the instant case is the substantiality of scientific proof upon which the Commission relied in concluding that the

1. Order

It Is Ordered that respondent Evis Manufacturing Company, a corporation, and its officers, and respondent Arthur N. Wells, individually and as an officer of said corporation, and said respondents' agents, representatives and employees, directly or through any corporate or other device, in connection with the offering for sale, sale or distribution of their product, known as the "Evis Water Conditioner", or any other product of substantially similar design or construction, whether sold under the same name or under any other name, in commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from representing, directly or by implication:

That their said product:

(a) has a catalytic effect on water;

(b) changes the physical behavior of water;

(c) will solve hard water problems;

(d) will make hard water soft;

(e) will cause hard water to feel, taste or act softer, or have any of the attributes or characteristics of soft water;

(f) will remove or reduce unpleasant odors or flavors from water;

(g) will make water taste better;

(h) will improve the taste of beverages or foods;

(i) will require the use of less soap;

(j) will reduce the cost of heating water;

(k) will eliminate or reduce the harshness of water to the hands;

(l) will cause dishes or glassware to dry without leaving water stains;

(m) will remove grease;

(n) will prevent or remove scale;

(o) will prevent, reduce or eliminate scum;

(p) will prevent, reduce or eliminate rust stains;

(q) will prevent, reduce or eliminate corrosion or retard pitting of metal;

(r) will improve the action of chemicals used for water softening purposes;

(s) will leach out alkali and salts in soil;

(t) will improve the growth or production of agricultural or orchard products or plants;

(u) will improve the texture or structure of soil;

(v) will reduce the amount of water required for agricultural irrigation;

(w) has any beneficial effect upon water.

Evis pipe does not have any beneficial effect upon water, and in ruling that any contrary representations by petitioners are false, misleading and deceptive. This decision was based upon an amazing uniformity of view among the scientists who testified on behalf of the Commission and who had many years of experience in chemistry, physics and engineering, including the more specialized field of water treatment. Their unanimous opinion was that the Evis pipe could not affect water."

■ In this proceeding to review an Order of the Federal Trade Commission, it is our duty to examine the record as a whole, including decisions of the Examiner, in order to determine whether evidence supporting the Commission's Order is substantial. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456; and Minneapolis-Honeywell Reg. Co. v. Federal Trade Com'n, 7 Cir., 191 F.2d 786, 789.

The record is voluminous but our task in discussing the evidence is greatly lightened by the comprehensive Initial Decisions of the Hearing Examiner. The Commission does not challenge the accuracy of his narration of the evidence; it finds fault only with his evaluation of the evidence and his conclusions therefrom.

### Evidence Relied Upon by the Commission.

From its opinion and from statements in its brief, it is apparent that in arriving at its findings and conclusions, the Commission relied upon the opinions of 19 experts and a so-called admission that 3,000 installations of the Evis Water Conditioner were failures. The experts' opinions were based upon experiments and laboratory tests performed with the Evis Water Conditioner. The Commission considered the so-called admission,

that 3,000 users would have testified that Evis was a failure, as a complete refutation of the testimony of petitioners' 91 "user-witnesses" [2] who had used the device in homes, in industry, and in various types of business.

Arthur F. Tudury, a witness for petitioners, an engineer and operator of an engineering supply business known as Refrigerating and Power Specialities Company, testifying as to the origin and purpose of the manufacturer's instructions, stated that he handled Evis Water Conditioners as an agent or distributor since late summer of 1952; [3] that he had sold or distributed in excess of 18,000 of the Evis units. He said that when he and associates started out with the device, they were under the impression that all that had to be done was to install the Evis in a pipe line and it would remove the scale, and in many cases that proved to be true. [4] The first instructions merely provided for fitting the unit into the main water supply line. [5] After numerous installations, however, difficulties appeared, [6] and after twenty, thirty, forty, fifty thousand of the units were operating, troubles began to show up, and investigations disclosed that electrical disturbances in the pipe lines were causing trouble, and that installation of shunting and grounding wires were necessary to make the unit function. [7] He testified it has been the practice of the company to continually modify their instructions as experience was gained in the field. [8]

Mr. Tudury said [9] that 30 representatives of the company from various parts of the United States convened and pooled all of their knowledge of Evis installation and techniques into a bulletin (Petitioners' Exhibit 34 bearing date of its issuance, July 31, 1953), and he testified in response to the question:

"Q. Was the purpose then to have this one bulletin the complete picture of all the installation instruc-

2. Respondents' Brief, pp. 10, 11, 24.
3. R.IV 2909.
4. R.IV 2922.
5. CX2, R.VI 818.

6. R.IV 2923.
7. R.IV 2924.
8. R.IV 2927, 2928.
9. R.IV 2931.

...

tions so that someone completely unfamiliar with the product could then —he would then know everything that you had accumulated over the years with your own experience in the field? A. That's correct."

Another bulletin, issued about the time that petitioner's Exhibit 34 was issued, contained advice and instructions for the use and testing of the Evis Water Conditioner, among them being:

The Evis Water Conditioner is designed to improve the quality of water for service in homes, etc.;

It does not add nor take anything from the chemical composition of the water;

Evis is not a softener;

It does not change the amount of hardness that is found in the raw water;

Like any other useful tool or instrument, the Evis has its limitations. For example, the Evis action cannot prevent scale in waters which have more than a specified amount of scale forming material;

Evis water must not be mixed with untreated water;

Evis pipeline system must be grounded.

Misguided Tests: Improperly improvised testing procedures have, all too often, resulted in erroneous evaluations of the usefulness of the Evis Water Conditioner, etc.

Practical testing without proper guidance from Evis personnel can yield gloomy results, for the following operational reasons: (Then follows the list of reasons stated.)

The record indicates that instructions for installation of the device were issued from time to time, modified and changed, to meet the result of user experience.

Disregard of the Manufacturer's Instructions, Examples:

The Hearing Examiner in his Initial Decision after remand, points out instances of disregard of instructions, some of which are the following:

"A number of the manufacturer's instructions relative to the installation of the Evis Water Conditioner were not followed by Witness Merrell in its installation. There is some doubt, therefore, as to whether the water referred to, by this witness, as 'Evis-treated water' was in fact treated in such a manner as to merit that description. Furthermore, the experiment was conducted in direct contravention of the instructions of the manufacturer of the Evis Water Conditioner that in order to obtain satisfactory results, untreated and treated water should never be mixed. When interrogated concerning his knowledge of the manufacturer's instructions on this point, he stated,

"A. Possibly to obtain the results that the manufacturer claims you should put it on in the position that he states, but to determine results such as I have determined, I don't see that it would make any difference how you put it on.

"Q. That is your opinion? A. That is my opinion.

"Q. In other words, in your opinion, you could ignore, for the purpose of this test, the manufacturer's instructions? A. That is right.

"Q. Do you understand the theory upon which Evis operates? A. No, it has never been explained to me.

"Q. So you have no way, then, of determining whether the manufacturer's instructions actually relate to the operation of Evis in any way? A. That is right.[10]

"Q. * * * but in each case where you had Evis treated water you put into the flask untreated water and mixed it with the Evis water, did you not? A. We put in odorfree untreated water, yes."[11]

10. R.II 31, 32.

11. R.II 68.

Then follows in the record other questions and answers showing disregard of instructions.

On p. 23 of said Initial Decision after remand, the Hearing Examiner's comment on the testimony of Commission's witness Joe Carson Mallory was:

"Witness Joe Carson Mallory, a Materials Testing Aid, Harbor Department, City of Los Angeles, testified to a rinsing test with watch glasses which he performed under the direction of Witness Carroll M. Wakeman, Testing Engineer and Mr. Mallory's superior. The watch glasses used in the test were washed with untreated water, rinsed in distilled water, and then a number of them were rinsed in tap-water and an equal number in water which had been passed through the Evis Water Conditioner.[12] Both sets of glasses were equally water-stained. This test contravened the manufacturer's instruction that water which has been passed through the Evis Water Conditioner should never be mixed with untreated water. When Mr. Wakeman was cross-examined concerning this test, the performance of which he had outlined and directed, he said it 'was of no concern' to him how the glasses were washed, and that 'we didn't place any particular confidence in the test.' [13]

"[Commission] Witness Leo Benezra testified to a similar test, in which he used water glasses, as follows: [14]

"A. The rinsing test was very simple. I actually washed four identical glasses, or eight identical glasses in a solution of warm water and soap, and rinsed four of them with Evis and four of them with controlled.

"Then I hung them up to drain and dry, and I numbered with a wax pencil and asked two other people to pick and examine these glasses for drain streaks, and they actually picked for the dirtiest ones, two of the Evis and two of the control, and the cleanest ones, two of the Evis and two of the control.

"Q. Did you observe the results of those? A. I did.

"Q. Did you detect any difference between those rinsed in the Evis and those in the control water? A. No difference."

Following the above, the Hearing Examiner observed: [15]

"It should be observed that these tests, like those previously considered with respect to Issue 3, relative to the removal of unpleasant odors, are laboratory tests rather than practical tests. In a home in which an Evis Water Conditioner has been installed according to the manufacturer's directions, dishes would be both washed and rinsed in Evis-treated water; they would not be washed in untreated water and then rinsed in Evis-treated water. As in the tests relating to odor-elimination, in testing for water stains Respondents' directions for the installation of the Evis Water Conditioner were ignored, and the observation hereinabove set forth on this point under Issue 3 is equally applicable here."

On the issue that the Evis Water Conditioner will not prevent or remove scale in boilers, water heaters, pipes, shower nozzles, or other parts of a water system, the Hearing Examiner commented: [16]

"It should be observed that no evidence was presented in support of the above allegation as to boilers, shower nozzles, or other parts of a water system, all of the evidence being with respect to scale in water heaters and pipes. Witness Merrell

12. R.II 141–144.

13. R.II 185–190; 214–216.

14. R.II 557, 561, 562.

15. P. 24 of Initial Decision after remand.

16. Pages 24 and 25 of Initial Decision after remand.

described the test he performed in order to determine whether the Evis Water Conditioner would 'remove old scale throughout the system', as follows: [Then followed a description of the test. The Hearing Examiner commented:]

"A number of the manufacturer's instructions relative to the installation of the Evis Water Conditioner were not observed. On cross-examination Witness Merrell was asked the question, 'In any event, on the basis of your prior testimony, I take it that if those instructions, in your opinion, were unimportant in these tests, you would feel that you could ignore them in making these tests anyhow—', to which he replied, 'With this device, yes' " [17]

The Hearing Examiner continued:[18]

" * * * Witnesses Mallory and Wakeman described a scale test conducted by them at the Los Angeles Harbor Station to determine the relative amount of scale that would be deposited in new copper pipes by water which had passed through the Evis Water Conditioner and by water which had not been so treated. They concluded that there was practically no difference.

"Their testimony on cross-examination revealed that the manufacturer's instructions for the installation of the Evis unit were not complied with in a number of particulars, including the requirement that electrical conduits be kept away from the piping system in which the Evis unit is installed. Not only was this instruction ignored, but an electrical circuit was wrapped around the pipe through which the Evis-treated water was flowing for the purpose of heating it. * * *

"Witness deBussieres performed a scale test similar to the one described above, in which he heated tap-water, and water that had passed through an Evis Water Conditioner, until both samples had evaporated, leaving 'dry scale'. Concerning such scale, the Evis literature states:

" 'A dry scale is nothing more than a residue after its water carrier has evaporated to dryness. * * * Hard water, zeolite-softened water, phosphate-softened water and even EVIS-ized water cannot escape leaving such dry deposits.'

"Similarly, Commission's Exhibit 31 points out that one of the 'Misguided Tests' procedures is 'boiling water samples down to dry total dissolved solids—there is no change in total dissolved solids.' Witness deBussieres admitted that if the Respondents do not claim either to add anything to or take anything from the water, he wouldn't expect to find any change as a result of his test. Concerning the instructions of the manufacturer for installing the Evis Water Conditioner, he testified:[19]

" ' * * * We didn't pay any attention to such instructions', and that he made no effort to determine whether the unit was 'properly installed'. He further testified:

" 'It would not have made any difference what the instructions were.' "

On this question of observance or failure of observance of manufacturer's instructions as to installations, tests, and use of the Evis device, respondent makes no contention that the installations and tests of its experts were made and carried on in accordance with the manufacturer's instructions. It attempts to meet this issue by depreciating the value and importance of the instructions. The Commission states in its brief (p. 32):

"The principal thrust of petitioners' contention is directed against the alleged failure of the scientists to observe installation instructions

17. R.II 33.

18. Pages 25 and 26 of Initial Decision after remand.

19. R.II 483.

and against the alleged irrelevance of the tests and experiments carried out by these Commission witnesses. Yet the very standards which petitioners invoke in support of their argument were not observed in a large number of installations which their consumer witnesses described as successful. In order fully to show the weakness of the assertions regarding the importance of these instructions, we shall briefly discuss them."

The Commission's determination of this case, largely based on "tests of experts" not following the instructions of the manufacturer in conducting their tests, is indeed something less than a reliance upon substantial evidence and was obviously unfair to the manufacturer. That it was unfair is supported by the testimony of a Commission witness, Carroll M. Wakeman, a testing engineer employed by City of Los Angeles Harbor Department, who, in testifying on behalf of the Commission, was asked:[20]

"Q. If, in fact, Mr. Wakeman, the manufacturer of the Evis Water Conditioner had specified instructions as to the manner in which the Evis should be installed, and the installation which you made in your laboratory completely ignored, and in many instances was contrary to those instructions, would you feel that you had given the product a fair test? A. I would not.

"Q. So that in the instant case, if it can be demonstrated that the product was incorrectly installed, the tests which have been presented here this morning, both by yourself and by Mr. Mallory, would not in any way be conclusive, is that correct? A. That is right."

The So-Called Admission

The Commission erred in considering a statement of counsel as an admission that 3,000 other users, had they been called to the stand, would have testified that Evis was a failure. The statement was considered as if it were a declaration of counsel standing alone, but a reading of the colloquy accompanying it indicates that it only was intended to convey the thought by counsel that of 100,000 users, he would concede that possibly 3,000 would be found who would testify that the water conditioner brought unsatisfactory results. The colloquy between Mr. Downs, for the Commission, and Mr. Michael, for the petitioners, came in the course of a hearing before Hearing Examiner Lipscomb at Washington, D. C., December 12, 1955.

At the beginning of the hearing, Mr. Michael, counsel for the petitioners, stated that he had asked for the hearing for the purpose of ascertaining whether a few decisions or agreements could be arrived at which would expedite the case. He referred to conversations and negotions with counsel for the Commission with that object in view. Interrupting an argument of Mr. Downs, Mr. Michael said:[21]

"Out of those discussions developed the fact that Mr. Downs contemplates, when the respondents rest their case, scheduling further hearings in the different places in the country to present what he considers rebuttal testimony. It is my understanding from my discussions with him that that rebuttal testimony is going to take the form of calling your witness[es] whose installations of the Evis Water Conditioner have been unsuccessful. For the purpose of trying to arrive at an early termination and some agreed settlement of the further hearings, I told Mr. Downs that I had no doubt but what he could produce such witnesses and that I did not feel that such witness[es] could testify to anything that was not already in the record.

"I pointed out to him that at the outset and I wish to reaffirm now, that I feel that legally such offer of testimony on rebuttal would be im-

20. R.II 202, 203.

21. R.V 3731, 3732.

proper and I wish to argue that matter to Your Honor in a moment.

"But for the purpose of trying to reach some agreement I was willing to make the concession that undoubtedly such witness[es] could be found and they would so testify. * * * "

Then, pointing out that no such agreement or arrangement had been arrived at, he continued:[22]

"For that reason we were unable to reach a final agreement. So there has been no agreement reached and I am here this morning to make an offer to rest, a conditional offer, condition 1, the Government resting or in the alternative upon the hearing examiner ruling on a motion, an alternative motion I am about to make namely the propriety of such rebuttal testimony."

Then Mr. Michael referred to authorities in support of his motion and contention that the proposed testimony of witnesses showing failure was not proper rebuttal.

Further in his argument, Mr. Michael called attention to two types of evidence which the Commission might have offered to support its charges that Evis will not perform as advertised and thereby injure the public. He referred to the opinion or expert testimony, and testimony of various members of the public who had installed and used the conditioner but did not get results that the advertising claimed for the device. He pointed out that the Commission elected to take only the opinion or expert evidence and called no "user witnesses." His point was that the Commission put on half of their case at the beginning and wanted to put on half of their case as rebuttal at the end. Mr. Michael added:[23]

"Finally I want to suggest that in this particular case, the evidence which counsel supporting the complaint proposes to offer is entirely unnecessary. His case in chief has proved, through his witnesses that there are a hundred thousand, roughly there were a hundred thousand witnesses sold at the time that reference was called. It was Mr. Voorheis or Mr. Wells. He has also proved by his own exhibits that the respondents have never claimed that the product works in every instance.

"He has proved by his own exhibits that the national average of success has been in the order of 97 percent.

"Our own witnesses which we called in our case, the respondents' witnesses have frankly conceded that it does not work in every case. The testimony of our distributors has shown that something in the order of 3 percent of the instances, the particular water, the type of installation, the particular electrolysis problem, the grounding problem is such that we have not had success.

"Taking that record, then as it now exists, a fair conclusion would be that there must be some 3,000 units throughout the United States that have not worked satisfactorily out of a hundred thousand.

"Now we have not disputed that fact in the record to date. We have come out and supported that conclusion with our own witnesses.

"We don't feel that that is critical to that case. We feel that a product of this type [with] 97 percent success average with a hundred thousand units throughout the country demonstrates the merit of the product.

"We feel that 3 percent is nothing more or less than what you would find for a national product on almost any product. What does counsel supporting the complaint propose to do? Is he going to add anything to the record that is not already there?

"He is going to go out and call five witnesses, ten, 20, a hundred, suppose he calls a hundred. What has he proved? He has proved that

22. R.V 3732.

23. R.V 3751, 3752.

he has brought in a hundred out of this potential 3,000 witnesses to testify that in their particular instances the product did not work. Has he said anything more? Has he proved anything more than what is already in the record?

"I submit he has not. And I submit it would be a tremendous waste of time and expense both to the Commission and to the respondents under those circumstances to require us to hold further hearings over a long period of time to take such testimony.

"That is where we hung up, if **I** may use that expression, in our negotiations. I had the feeling that that is the posture of the record."

After further observations of Mr. Michael, Mr. Downs, for the Commission, entered upon his argument and urged that he be permitted to introduce, in rebuttal, witnesses who would testify to unsuccessful experiences with the Evis Conditioner. The Hearing Examiner asked:[24]

"Mr. Downs, how many witnesses would you propose to present, more than the 3,000 which were mentioned by counsel for the respondent, which he admits, as I understand, that probably in the neighborhood of 3,-000 would admit unsatisfactory use of the Evis?

"Mr. Downs: I certainly do not propose to burden the record, the Hearing Examiner, nor the respondents with the tremendous task of calling 3,000 or more witnesses. I think the Hearing Examiner would properly put his foot down long before I reached that number.

"But by the same token, Mr. Examiner, I do not concede that the testimony that Mr. Michael has cited here proves that this instrument works 97 percent of the time and that there are only 3,000 installations that they have made that do not properly function.

"Hearing Examiner Lipscomb: What is the basis, again if you will please, of the 97 percent?

"Mr. Downs: That is something that Mr. Michael has cited that at the present moment I cannot put my finger on. If he can I would like to call upon him to set the Hearing Examiner straight.

"Mr. Michael: I think I can answer that, sir.

"We start out first of all with the testimony of the government witness, either Respondent Wells or Respondent Voorheis to the effect that at the time he testified approximately a hundred thousand units had been sold."

Then followed further discussion between the Hearing Examiner and Mr. Michael. Then Mr. Michael resumed:[25]

"Mr. Michael: * * * I am satisfied that as a matter of law, that there is good support for that position, but above and beyond that, we have the testimony of respondents' witnesses which have indicated that something on the order of 3 percent of the installations have been unsuccessful.

"Applying that 3 percent to the government's own testimony that there have been a hundred thousand units sold, we naturally come up with 3,000 units. I am prepared to say that as far as the respondents are concerned here, the statement in our advertisement we don't quarrel with.

"We take the position that they are 97 percent successful. By the same token we are willing to concede that there have been 3 percent unsuccessful.

"So far as the record we are in effect conceding that there are something in the order of 3,000 units throughout the country that we have been unable to make work.

"More than that I don't think you need to establish that concession."

24. R.V 3757, 3758.

25. R.V 3760.

After extensive discussion between the Hearing Examiner, Mr. Michael, and Mr. Downs, we then have the following:[26]

"Mr. Michael: I will say it as frankly and as bluntly as I can that I don't have any doubt in my mind —and as I said at the outset before —we don't claim it works in every case. We concede that 3 percent.

"Hearing Examiner Lipscomb: At least 3 percent.

"Mr. Michael: Have been unsuccessful and there have been a hundred thousand sold. If we wanted to take all the testimony available in the country you could probably find 3,000 witnesses in the country who would say it did not work. The only reservation I make is that by the same token it is our position that if we went to every nook and cranny in the country we would get the other 97,000 and we would both be doing what the record already shows.

"I can't say any more than that.

"Hearing Examiner Lipscomb: One part of your statement is an admission, the other is a self-serving declaration and they would be so regarded."

■■ From all that we have quoted above and more appearing in the record, it is obvious that no admission was intended. It is apparent that all that was intended by Mr. Michael was that out of 100,000 users, probably 3,000 of them would testify as to unsatisfactory results. In view of the circumstances under which it was uttered, both the Commission and the Hearing Examiner were clearly erroneous in emasculating Mr. Michael's statement by taking a portion of it as an admission and disregarding what immediately followed as to the possibility of procuring 97,000 users who would testify as to satisfactory results. The Order of the Commission in this case largely rests upon that error for we have seen the so-called admission was considered an "offset" by the Commission of the testimony of the 91 consumer or user witnesses called by the petitioners; and the so-called admission was given effect by the Commission without any consideration whatever of the possibility that numerous users, if called, may have testified to satisfactory results. There was no such admission by counsel. 31 C.J.S. Evidence § 277, p. 1029, citing Pulver v. Union Inv. Co., 8 Cir., 279 F. 699, 705, where the Court said:

"An admission must be certain, consistent, and definite. * * * It must be couched in language reasonably capable, without forced or strained construction, to bear the interpretation sought to be placed on it. Conjectural and suppositious statements are excluded. (Citing cases.)"

Therefore, the Commission erred in considering the so-called admission as a refutation of all or of any of the testimony of petitioners' user witnesses.

Petitioners claim error in the holding of the Commission, p. 10, Exhibit E attached to petition, that:

"Finally, we hold that under the circumstances of this case, the respondents were not privileged to stand upon their refusal to disclose the composition of the metal in the Evis Water Conditioner and the claimed special processing thereof as trade secrets; and their failure to introduce the evidence thus within their immediate knowledge and control, if existing anywhere, relative to such factors which might explain the claimed effects of the device on water, is strong confirmation of the charges in the complaint. [Citing Charles of the Ritz Dist. Corp. v. Federal Trade Com'n, 2 Cir., 143 F.2d 676, 679.]"

Mr. Wells was the inventor of the water conditioner. He testified that he was not a chemist and in answer to the question, "Are you an engineer?" he stated, "I have worked at the field of engineering for some twenty years"; he

26. R.V 3764.

testified that he was not a licensed engineer in the State of California.[27] Mr. Downs, conducting the direct examination of Mr. Wells as an adverse witness, propounded the question:[28]

"Q. Will you explain what it is that this unit does to water to warrant the name 'conditioner'?

"Mr. Michael: Objection. Before that question is answered, Mr. Examiner, I would like to note at this time an objection to this question and any others that seek to ask the witness to explain any of the secret formula or process by which the Evis Water Conditioner is manufactured.

"I have this thought in mind, that there are patent applications filed on the secret processes that are employed by the respondents. Until those applications issue a patent, they have nothing other than the common law of protection of maintaining to themselves the secret processes used, and in the event that the patent applications at any time should be denied, they would still have that common law protection, unless they are required or volunteer to disclose it to the public.

"Naturally, if it is disclosed to the public they lose that protection which the law affords them. I have no objection to any interrogation of the witness along the lines of the general type of treatment, or the general method by which the product is manufactured, so long as it doesn't invade what is considered by the respondents as the secret processes. that are used in the manufacture of the product and its use."

Then Mr. Wells, answering the question, gave as his explanation what warranted the use of the name "conditioner". He answered:[29]

"A. Yes. After the water has passed through the conditioner, there is a change that has taken place and the way that change appears to be exhibited is in the manner in which the water behaves with fine particles and at surfaces, you might say, that what is changed in the water is its behavior at the interface, which applies generally to the contact between a fluid and any other substance.

"Q. (By Mr. Downs) Now, will you tell us what this interface is? A. I just explained that this interface is the point of contact between one material and another.

"Q. Now, does this make any chemical change in the water? A. No, sir.

"Q. Makes no chemical change? A. No.

"Q. Just a change of the physical, of the behavior, I believe you said? A. Yes.

"Q. Well, now, will you explain the scientific principle by which this behavior, is, this change, this behavior is brought about?

"Mr. Michael: I will renew my objection, * * * so that the question is limited so it does not require the witness to divulge any of the secret formula or processes used.

"Mr. Downs: I think it is perfectly permissible for the witness to explain the scientific principle by which his instrument works.

"Hearing Examiner Lipscomb: I think you are correct in your position. Will you explain the scientific principle upon which your device works?

"A. I don't believe that science is prepared to describe very many mechanisms of action, including this. However, we do know this, that by the means employed such as the means we employed in the construction and structure of the metal of our unit we obtained this change in the water. Now, this change, of

27. R.II 412.

28. R.II 413.

29. R.II 414–418.

course, is quite easily noted by very many observations.

"Q. And it is the manner in which this unit is constructed that brings about the conditioning of the water; is that correct? * * * A. The manner in which the metal is processed.

"Q. Well, there must be some principle involved there, Mr. Wells? A. Yes.

"Q. Well, we would like to know what principle it is. If it is not scientific, what is the practical principle? A. The principle being to produce the most favorable metallic structure for the purpose of affecting the water in the desirable manner in which we do. It has been strictly experimental and cut and tried until the correct structure was developed for that purpose.

"Q. Well, everything, then, depends upon the structure of the unit; is that correct? A. Yes.

"Q. Do you have a specific formula to be followed in the construction of this unit? A. I have, yes.

"Q. I hand you, Mr. Wells, Commission's Exhibit No. 10, which has been put in evidence and identified as being one of your units that has been cut in two longitudinally. Will you look at that, please, and see if that is one of your units? A. Yes, it appears to be.

"Q. I notice that it has on the inside of it what appears to be a vertical post; is that correct? A. Yes.

"Q. Now, is this unit made in one casting or is it made in more than one casting?

* * * * * *

"A. It is an integral casting, yes.

"Q. One integral casting. Now, is this vertical post made of the same elements, the same material as the outer portion of this instrument?"

Here Mr. Michael renewed his objection and advised his client that if these questions approach a point where he feels it is invading the secret processes he employs in the manufacture of this product, impinging upon the secret nature of his processes, to so advise the Examiner. Then the witness Wells stated: [30]

"The Witness: Well I feel that any further discussion beyond the existence of the integral casting along these lines would lead to divulging material which we don't, which is in the category of a secret process."

After discussion, the Hearing Examiner commented: [31]

"Hearing Examiner Lipscomb: I think the question could be answered yes or no without invading the trade secrets.

"The witness is directed to answer the question.

"A. Yes.

* * * * * *

"Q. (By Mr. Downs) What is the formula by which this instrument is cast, Mr. Wells?"

Then after objection and argument the Hearing Examiner said: [32]

"The Hearing Examiner does not wish to embarrass the respondent in any way, but he does not see how the issues of this proceeding can be adjudicated and the allegations determined without an answer to the question which has been propounded. It seems to me that that is essential under the charges of the complaint.

"Mr. Michael: Then I will instruct my client to answer the question to the extent that he can do so without disclosing the secret formula that is employed.

"A. [To the question: 'What is the formula by which this instrument is cast, Mr. Wells?'] This unit

30. R.II 419.

31. R.II 420.

32. R.II 422.

is made of cast iron. You will find in our advertising the reference to the fact that we have cast iron units and we have bronze units. Hence the metallic formulas of cast iron are easily found and known, and likewise the composition in bronze. However, these structural metals which are used are processed for the purpose of producing this effect upon water, and in that respect they are different from ordinary cast iron in the one case, or ordinary bronze in the other case.

"Q. (By Mr. Downs) Now let me see if I understand that, Mr. Wells. You say that the elements contained in the unit are the same elements as found in cast iron, but the processing of it gives it something special, is that correct? A. That is correct.

"Q. What is this processing that gives it something special?"

Mr. Michael then renewed his objection and renewed his instruction to the witness not to disclose any secret formula.

"Q. Would a spectrographic or spectro analysis of this instrument disclose all of the elements in it? [33] A. I would say that a spectro analysis would disclose the fact that this cast iron is cast iron.

"Q. Are there any secret elements in this that a spectroscope analysis would not show up?"

Then followed objection and discussion; then the question: [34]

"Q. Does this special processing add elements to this unit, to this casting? A. I hesitate to answer that."

Mr. Michael then renewed his objection and again instructed the witness as before.

"Hearing Examiner Lipscomb: I think the answer would not disclose such a secret process, the secret of the process. Therefore, the witness is directed to answer the question.

\* \* \* \* \* \*

"A. Yes.

"Mr. Michael: You mean, are there elements in this casting that you won't find in cast iron, is that it?

"Mr. Downs: He has referred to a special processing of this casting, and the question was, in that processing does he add elements to it not found in ordinary cast iron.

"Hearing Examiner Lipscomb: He answered 'Yes.'

"Q. (By Mr. Downs) You do add an element or more? A. Yes.

"Q. What elements are those?

"Mr. Michael: That is objected to, if the Examiner please, on the grounds previously stated regarding the naming of the elements as essential to the establishment of the identity of the product.

\* \* \* \* \*

"Hearing Examiner Lipscomb: Let us have the particular question read, please.

"(Question read.)

"Hearing Examiner Lipscomb: What elements are added to the cast iron?

"The witness is instructed to answer the question.

"Mr. Michael: I am afraid, with all due respect to the Examiner and counsel, that if the witness feels the answering of that question would disclose the secret process involved, I advise him, as his counsel, not to answer the question.

"A. Accordingly, that question shall not be answered.

"Hearing Examiner Lipscomb: At the present time.

"The Witness: At no time."

■ The reasons for the refusal of Mr. Wells to disclose the Evis method of processing metal are apparent from the above quotations from his testimony. If applications for patent were pending, and there is no contention that they were not,

33. R.II 423.

34. R.II 425.

the witness and counsel had reason to fear that public disclosure of secret processing or metal composition would render such secrets public property. Such secret processing is protected by rules of practice in patent cases. 37 C.F.R. § 1.14. And in contested cases in the patent office, a witness may not be held in contempt for refusing to disclose any secret matter except upon appropriate order of the court which issued the subpoena. 35 U.S.C.A. § 24. It is therefore apparent that the "refusal" on the part of the inventor Wells to disclose the composition of the metal in the water conditioner, under the circumstances as shown above, cannot be the basis of an inference or presumption that an answer to the question propounded would support the allegation of the complaint that the Evis Water Conditioner is not made of a specially processed metal, or support any other charge made in the complaint.

In 8 Wigmore on Evidence, 3d Ed. 1940, p. 156, § 2212, the author states:

"In a day of prolific industrial invention and active economic competition, it may be of extraordinary consequence to the master of an industry that his process be kept unknown from his competitors, and that the duty of a witness be not allowed to become by indirection the means of ruining an honest and profitable enterprise. This risk, and the necessity of guarding against it, may extend not merely to the chemical and physical composition of substances employed, and to the mechanical structure of tools and machines, but also to such other facts of a possibly private nature as the names of customers, the subjects and amounts of expense, and the like.

"Accordingly, there ought to be and there is, in some degree, a recognition of the privilege not to disclose that class of facts, which, for lack of a better term, have come to be known as trade secrets."

In Charles of the Ritz Distributors Corporation v. Federal Trade Com'n, 2

Cir., 143 F.2d 676, 678, cited by the Commission, the Court said:

 * * * Two medical experts, one a leading dermatologist, testified for the Commission; and both affirmatively stated that there was nothing known to medical science which could bring about such results. There was no testimony to the contrary; but petitioner asserts that, since neither expert had ever used Rejuvenescence Cream or knew what it contained—petitioner being unwilling to reveal its secret formula—their testimony was not the substantial evidence necessary to support the final findings and order below. Despite their lack of familiarity with petitioner's product, however, the general medical and pharmacological knowledge of the doctors qualified them to testify as to the lack of therapeutic value of the cream. Citing cases. Further, petitioner was not privileged, under the circumstances, to stand upon its refusal to disclose the true formula of its preparation as a trade secret,. Coca-Cola Co. v. Joseph C. Wirthman Drug Co., 8 Cir., 48 F.2d 743,. 747; 8 Wigmore on Evidence, 3d Ed. 1940, § 2212; and its failure to introduce evidence thus within its immediate knowledge and control, if existing anywhere, of the rejuvenating constituents and therapeutic effect of its preparation is strong confirmation of the Commission's charges."

Unlike the Ritz case, there is evidence here contrary to the testimony of the experts. Here we have the testimony of 91 user witnesses as to favorable results from use of the Evis Water Conditioner. And further, it does not appear from a reading of the Ritz case that any application for patent was pending or that there existed any other plausible reasons for withholding the so-called secrets of the formula.

 Referring again to the holding of the Commission (p. 10 of Exhibit E

attached to petition), to the effect that the refusal of petitioners to disclose the composition of the metal of the Evis Water Conditioner and the claimed special processing thereof is strong confirmation of the charges in the complaint, and to the authorities cited in support of that contention (Charles of the Ritz Distributors Corporation v. Federal Trade Com'n, supra), we note that the Commission's conception of the rule does not consider the qualification of adequate explanation, and a reading of the Ritz case does not disclose any excuse or reason given for the failure to disclose. The rule is stated in the article on Evidence, 31 C.J.S. § 156, p. 851, as follows:

"An unfavorable inference may result from the unexplained failure of a party to produce documentary or other real evidence."

Here a reasonable and adequate explanation for the refusal to disclose was given. And, furthermore, the question of whether the Evis Water Conditioner is made of a specially processed metal was rendered irrelevant and immaterial by the Commission itself and by its finding No. 5 has been removed from consideration in this case. Among other things, the finding states:

"Accordingly, the foregoing statements and representations are false, misleading and deceptive with the exception of the representation that the Evis Water Conditioner is made of a specially processed metal, as to which representation the allegation in the complaint has not been proved."

In determining whether there is substantial evidence in this record supporting the Commission's decision, we must eliminate from our consideration the above described so-called admission and the inference drawn as in support of the complaint by the Commission by reason of the refusal to disclose the processing and composition of the metal in the Evis Water Conditioner. We are left then with the opinions of the experts as the only evidence in the record tending to support the findings and conclusions of the Commission, and, as we have seen, those opinions were the results of tests made in disregard of the instructions of the manufacturer as to tests and as to installation of Evis units; and, as we have hereinabove pointed out, such tests in themselves and standing alone cannot be considered as substantial evidence in support of the complaint. The Commission in its brief recognizes, and it appears from the record, that 91 witnesses testified on behalf of petitioners that they obtained beneficial results from the use of Evis pipe.[35]

The Commission took the position that the so-called admission that " * * * 3,000 other users, had they been called to the stand, would have testified that Evis was a failure, so that the statements of petitioners' witnesses would have been more than offset. * * * " As there was no such admission, one of the Commission's purported reasons for discarding and ignoring the testimony of petitioners' 91 user witnesses is extinguished. The Commission, continuing its argument (pp. 10 and 11 of its brief), claims that it "was eminently justified in resting its decision upon the scientific evidence and in holding that the Evis pipe has none of the effects claimed by petitioners."

Vacu-Matic Carburetor Co. v. Federal Trade Com'n, 7 Cir., 157 F.2d 711, 713, is cited to support a Commission contention that " * * * the scientific testimony presented to the Commission stands uncontradicted by any other scientific testimony regarding the effectiveness of the Evis pipe. Thus, this is not a case in which the Commission was confronted with a conflict of views of scientists and the problem of resolving such conflict." In that case, the Court of Appeals said:

"Briefly, a number of witnesses who had purchased and used petitioner's device testified to a marked increase in the saving of gasoline. Petitioner also introduced some so-

---

35. Respondent's Brief, pp. 10, 24.

called expert testimony to the same effect. On the other hand, the Commission introduced no testimony from any purchaser and user of petitioner's device who testified to the contrary, notwithstanding the fact that more than 200,000 had been sold to the purchasing public prior to 1940. The Commission in support of its case offered the testimony of a number of highly trained and qualified experts who had made every recognized test and who uniformly testified in substance that there was no merit in petitioner's device."

The experts here did not make "every recognized test." They ignored the manufacturer's instructions as to the testing of its product. Our attention is not called to any apparent obstacle preventing the following of the manufacturer's instructions and no reason is given for the failure to heed them. Why the experts here did not follow instructions does not appear but the persistent disregard of the instructions weakens and in great measure nullifies the value of the Commission's scientific evidence. Such failure to follow instructions was obviously unfair.

The Hearing Examiner, in each of his Initial Decisions, referring to evidence presented by respondents, commented: [36]

"As previously stated, Respondents presented one hundred witnesses, ninety-two of whom were users of the Evis Water Conditioner in many types of practical installations, including industrial plants, lumber mills, public buildings, hospitals, supermarkets, laundries, cleaning shops, schools, ocean-going vessels, oil fields, department stores, dairies, nurseries, ranches, apartment buildings and private homes. Each user-witness testified to one or more benefits obtained from the use of the Evis Water Conditioner. Each such witness also testified that he had been faced with critical water problems in the operation of various types of equipment and water systems, and that the use of the Evis unit had substantially alleviated such problems, with substantial savings to him in manpower, cleaning and repair costs, fuel and power bills and so forth.

"Many of these witnesses were not merely consumers, but were licensed professional engineers or operating engineers with long practical experience in the operation and maintenance of various types of water-using equipment and water systems and the problems incident thereto. Many of them were directly responsible for the proper, efficient and economical operation of equipment depending upon a water supply. None of the witnesses professed to understand the theory upon which the Evis Water Conditioner operates. Most of them stated that they were skeptical of the device prior to its installation in their water system. Some of the witnesses purchased the device only upon the Respondents' money-back guarantee, and paid for it only after it had proven itself to their satisfaction. A number of the witnesses testified that they had made parallel practical tests in the use of the Evis Water Conditioner, in which one part of their equipment was supplied with Evis-treated water at the same time another part was supplied with untreated water."

This Court is not barred from setting aside the Commission's decision, and we may do so on the ground that we cannot conscientiously find that the evidence supporting that decision is substantial, and we may take into account whatever in the record fairly detracts from the weight of the evidence which underlies the agency order and is opposed to the agency's view. Carter Products, Inc. v. F. T. C., 9 Cir., 268 F.2d 461, 493.

The Commission erred in disregarding the testimony of the user witnesses.

36. First Initial Decision, pp. 33, 34; and Initial Decision after Remand, pp. 35, 36.

We cannot sustain the findings of the Commission; they are unsupported by substantial evidence.

With the exception of that portion thereof dismissing the complaint as to respondent Joseph T. Voorheis, the Order of the Federal Trade Commission is set aside.